## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF KENTUCKY
## PIKEVILLE DIVISION

IN RE:  FORTRESS RESOURCES, LLC                                    CHAPTER 11
       dba McCoy Elkhorn Coal Company

DEBTOR                                                    CASE NO. 15-15-70730

### AFFIDAVIT OF GARY J. SMITH, PRESIDENT & CEO
### OF DEBTOR IN SUPPORT OF FIRST DAY MOTIONS

Affiant, Gary J. Smith, first being duly sworn, states and deposes as follows:

1)        I am the President and CEO of Fortress Resources, LLC (the Debtor").

2)        On November 5, 2015 (the "Petition Date"), the Debtor filed with this Court a voluntary petition for relief under Chapter 11 of the United States Code (the "Code"). The Debtor is operating its business as a debtor and debtor-in-possession pursuant to Code §§ 1107(a) and 1108. No request has been made for the appointment of a trustee or examiner, and no committee has been appointed in this case at this time.

### Debtor's Pre-Bankruptcy Background

3)        The Debtor is a Delaware limited liability corporation formed as a subsidiary of Opes Resources, LLC of Canada in May 2014 for the purposes of acquisition and operation of coal mining facilities in the United States. Exclusive of preferred shareholders of the Debtor, Opes Resources, LLC owns 99% of the members interest in the Debtor and Affiant owns 1% of the members interest.  Since its formation, the only coal mining facilities acquired or operated by the Debtor is a portion of the James River Coal Company's Pike County, Kentucky operation which was known as the McCoy Elkhorn Coal Corporation. The Debtor operates under the assumed name of "McCoy Elkhorn Coal Company."

4)    The Debtor's principal office is located at 484 Tollage Creek Rd, Pikeville, Kentucky 41501, but it also maintains a one-room office in Wise, Virginia.    The Debtor's principal assets are located in Pike County, Kentucky.    The Debtor is authorized to conduct business in Kentucky.

5)    On September 5, 2014, the Debtor purchased the McCoy Elkhorn Mining Company facility through a combination of equity investment (equity raised by subscription to preferred shareholders) and a loan package with Callidus Capital Corporation (hereinafter, "Callidus"), a Canadian lender.    Initially, Callidus extended a loan of $11,350,000 to the Debtor to purchase the assets from James River, to replace the outstanding reclamation bonds as required by James River, and working capital/start-up costs to resume mining (James River had idled the mines in 2013 during its Chapter 11 bankruptcy proceeding).    On January 9, 2015, Callidus and the Debtor modified the loan facility into two parts, being "Facility A Note" for a revolving line for $5 million, and "Facility B Note" for a term equipment loan in the amount of $13,500,000.    The maturity date of the two facilities was September 5, 2015, and despite efforts of the Debtor, was not extended prior to the filing of this Chapter 11 case.    As of the Petition Date, the Debtor owed Callidus the sum of $5,326,778.64 on Facility A Note (also referred to as the "Revolver" by the Debtor), and the sum of $13,500,000 on Facility B Note (only interest was paid).

6)    The Debtor owns four deep mines which are identified as Mine 15, Mine 15A, Mine 16, and Mine 23.    The Debtor has substantial coal reserves of high quality coal, including metallurgical coal.    The Debtor began mining coal in late September 2014 and coal sales commenced in December 2014. Throughout the winter, spring and early summer

of this year, the Debtor operated Mine 15 and Mine 23[1] and increased production to approximately 100,000 tons per month; the Debtor has mined a total of 659,066 tons of coal in year-to-date in 2015.    At the peak of operation, the Debtor employed as many as 220 employees in Pike County, Kentucky.    The Debtor primarily sells coal on the spot market, but had one long-term contract during 2015 for consistent sale revenue.    By July 2015, the Debtor had significantly paid down the amount owed to Callidus on "Facility A Note" to approximately $700,000.

7)    In September and October, 2015, the Debtor experienced a significant drop in demand for its coal.    The market price of coal dropped from about $58 to $60 per ton for the Debtor's coal into the low $40 range due to an over-supply of coal.    The Debtor experienced difficulties selling its clean coal on the market due to its customers being unable to accept delivery of coal.    During this time, the Debtor borrowed additional funds from "Facility A Note" for working capital to continue mining, thereby increasing its inventory of clean coal during this time.    Simply explained, the Debtor does not have a production problem, but has a sales problem.

8)    On the petition date, the Debtor has approximately 141,000 tons of clean coal and 2,214 tons of raw (unprocessed) coal in its inventory ready for shipment in nine (9) separate stockpiles.    The Debtor values said coal stockpiles at $7,089,410.    As a result, the Debtor suspended mining operations and furloughed 180 employees on October 7, 2015.    On October 19, 2015, the Debtor called 28 employees back to work, but then furloughed those 28 employees on November 1, 2015.    Presently, the Debtor employees about 34 employees to maintain the "hot idled" mines.    The hot idle is necessary so the

---

[1]    Mine 15A is a contract mine., which operated for a few weeks, but was hot idled.

Debtor can re-call its full workforce and quickly being mining again when sufficient demand for coal returns in the winter months.

### Bankruptcy

9)    The Debtors filing of its Chapter 11 bankruptcy on Thursday evening, November 5, 2015 was precipitated by the unwillingness of Callidus to extend additional available funds from Facility A Note in order to meet ongoing demands of the business. If the Debtor had not filed this bankruptcy case, it could not have continued to maintain its hot idled mine sites resulting in a significant drop in the value of the Debtor's assets and a significant reduction in the potential recovery available to the Debtor's creditors. Further, without additional draws on Facility A Note, the Debtor could not pay its payroll due on November 6, 2015 in the amount of $84,786, plus the vehicle allowance of $8,608 to its employees.    The Debtor also needed to pay First Insurance Funding the sum of $98,968 that was due to keep its insurance policies in force.    On the Petition date of November 5, 2015, the Debtor had cash-on-deposit in various accounts of $194,846, with no ability to pay other on-going costs of operations.

10)    As noted above, Callidus is the primary secured creditor of the Debtor. Callidus holds a first and prior security interest in all assets of the Debtor, except a mobile home, a utility trailer, and the Debtor's cash accounts at PNC (see Docket No. 23). Other secured creditors are identified in the Notice of Filing of Loan Documents (Docket No. 21).

11)    The Debtor has filed certain First Day Motions: a Motion to Establish Notice Procedures and a Master Service List [Doc. No. 20]; a Motion to Change Hearing Locations [Doc. No. 13]; Motion for an Interim and Final Order (1) Prohibiting Utilities from Altering, Refusing or Discontinuing Service to the Debtor, and (2) Establishing Procedures for (A)

Determining Requests for Assurance of Payment, and (B) Modifying the Amount of Assurance Payment that a Utility Demands as Adequate [Doc. No. 19]; Motion to Continue Making Payments to Maintain Insurance [Doc. No. 18]; Motion for Entry of Interim Cash Collateral with Callidus [Doc. No. 24]; a Motion to Authorize Payment of Pre-Petition Accrued Employee Wages, Salaries and Withheld Taxes and Employee Benefits [Doc. No. 25]; and an Emergency Motion for Order Approving Shortened and Limited Notice of Expedited Hearing on Certain First Day Motions and Applications [Doc. No. 22 and 26].

12)    Affiant has read the Debtors First Day Motions set forth above, as well as the notes, security agreements and UCC-1 financing statements filed at Docket No. 21 and 23. Affiant believes said motions and documents are true and accurate to the best of my knowledge, information and belief.

13)    Affiant further believes that the relief sought in the First Day Motions is critical to the Debtor's successful reorganization, to the protection of the Debtor's assets, and necessary for the efficient administration of this Chapter 11.

Further, Affiant Sayeth Naught.

Dated: November 9, 2015                    FORTRESS RESOURCES, LLC

By:    _____
       Gary J. Smith, President and CEO

COMMONWEALTH OF KENTUCKY          )
                                  )
COUNTY OF ___PIKE___              )

     Subscribed, sworn to, and acknowledged before me by Gary J. Smith, in his capacity as President and CEO of Fortress Resources, LLC on November 9, 2015.

_Sharon S. Stewart_
Notary Public, State at Large
My Commission Expires: ___04/16/2016___

